have gone further than they did, for they could have gone on without fear of contradiction. On the other hand, had Mrs. Miller gone so far as to say in substance or effect that her husband was led by her promises to make his will for her benefit, or that she held his estate as trustee merely, Mr. Pettengill and Mr. Salisbury had, or should have had, sufficient interest in the subject of the conversation and sufficient appreciation of its significance to be expected to note carefully and remember accurately any such declarations, and even to seek to perpetuate such admissions in written form, so that after her death the trust estate would not depend on the "uncertain testimony of slippery memory" in case she should change her mind and alter her will, or so that the evidence thereof would not be wholly lost should she survive the two recipients of her confidence. They do not undertake to give Mrs. Miller's precise words, and the precise words are important. I cannot draw the inference from their narrative that Mr. Miller intended to leave his property to his wife in trust only. Their testimony suggests the wishes of Mr. Miller, and the desire, and even the promise, of Mrs. Miller to carry out such wishes; but it does not suggest fraud on the part of Mrs. Miller in disposing of the property as her own.

The execution of the Salisbury will by Mrs. Miller, although greatly relied upon by the plaintiffs as evidence to corroborate their oral proof, is not consistent with the theory of a trust, and, at most, must be regarded as negligible on the main point. No evidence of the trust is incorporated in the will, nor in any accompanying writing, as might be expected under the circumstances, if such evidence was at hand. Indeed, the circumstances surrounding the execution of the Salisbury will are, to my mind, cogent proof that testatrix, when she executed it, was gratifying a wish rather than discharging an obligation, and was making an ambulatory will, rather than a fixed and irrevocable declaration of trust, and that what she said and did at that time was so understood by Messrs. Pettengill and Salisbury. A form of will to meet the case would readily have suggested itself. Matter of Gloucester (Surr.) 11 N. Y. Supp. 899. A binding agreement to make a certain will is not to be inferred from the making of the will. Edson v. Parsons, 155 N. Y. 555, 50 N. E. 265.

The court cannot make a new will for Mr. Miller, nor enforce moral obligations imposed upon Mrs. Miller, whether by herself or by her husband.

Complaint dismissed. Decision accordingly.

---

PNEUMATIC SIGNAL CO. v. TEXAS & P. RY. CO.

(Supreme Court, Appellate Division, Fourth Department. July 6, 1909.)

1. CONTRACTS (§ 290*)—BUILDING CONTRACTS—CONSTRUCTION.

    A contract for the installation of an interlocking railroad signal system stipulated that the system should be satisfactory to the state railroad commission. The commission refused to approve the system because of inherent defects. The failure of the railroad company to comply with an

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

order of the commission did not influence the ultimate decision of the commission. *Held*, that the railroad company did not, by failing to comply with the order of the commission, waive its right to insist on an approval of the commission.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1317; Dec. Dig. § 290.*]

2. CONTRACTS (§ 290*)—BUILDING CONTRACTS—CONSTRUCTION.

A contract for the installation of a system of interlocking railroad signals stipulated that the system should work to the satisfaction of the state railroad commission, and in the event the commission did not accept it the contractor should forfeit the price and the work done and the materials furnished. The railroad company used the system for three years, when the commission finally refused to accept it. The system was left in place to be operated on the tracks of the company. It had not been fully tried, and the parties were simply anticipating the final action of the commission. The contractor made no demand for pay during such period, and there was no expectation that payment was to be made until acceptance by the commission. *Held*, that the use of the system by the company did not prevent it from urging the nonapproval of the commission as a bar to an action for the price.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1370; Dec. Dig. § 290.*]

3. CONTRACTS (§ 284*)—BUILDING CONTRACTS—CONSTRUCTION.

A contract for the installation of a system of interlocking railroad signals, stipulating that the system should work to the satisfaction of the state railroad commission and that in the event of the nonacceptance of the system by the commission the contractor should forfeit the price and the work done and the materials furnished, requires the contractor to obtain the approval of the commission necessary to enable the railroad company to permanently use the device; and the contractor, in the absence of evidence that the approval was unreasonably withheld or of collusion between the commission and the company, cannot recover the price.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1308; Dec. Dig. § 284.*]

4. CONTRACTS (§ 284*)—BUILDING CONTRACTS—CONSTRUCTION.

A contract for the installation of a system of interlocking railroad signals, stipulating that the system should work to the satisfaction of the state railroad commission and that in the event of the nonacceptance of the system by the commission the contractor should forfeit the price and the work done and the materials furnished, did not make the commission the agent of the railroad company, but its approval of the system was essential to a performance of the contract.

[Ed. Note.—For other cases, see Contracts, Dec. Dig. § 284.*]

Robson, J., dissenting.

Appeal from Trial Term, Monroe County.

Action by the Pneumatic Signal Company against the Texas & Pacific Railway Company. From a judgment for defendant, entered on a directed verdict, and from an order denying a new trial, plaintiff appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Medcalf, Averill & Tompkins, for appellant.
George S. Cooper, for respondent.

SPRING, J. The plaintiff, a domestic corporation of this state, has sued the defendant, a Texas railroad corporation, to recover the con-

tract price for installing a system of interlocking railroad signals at Texarkana, in the state of Texas, on the railroad of said defendant. The parties entered into a written contract in 1903 whereby the plaintiff agreed that:

"It * * * shall and will * * * perform all the labor and furnish all the material, except as hereinafter specified, necessary to install the Pneumatic Signal Company's interlocking system on the railroad of the party of the second part," and "to construct the said interlocking system in a first-class and workmanlike manner, in all its parts, and to provide all necessary fixtures and appliances, except as hereinafter specified, to enable the said system properly to perform its functions, whether hereinafter specifically described or not, and that the materials and apparatus to be furnished and labor to be performed by the said party of the first part [the plaintiff] shall be in conformity with the attached specifications and satisfactory and acceptable to the chief engineer or other authorized officer of the party of the second part and to the engineer of the railroad commission of Texas."

The plaintiff further agreed to complete the plant by January 1, 1904 (later extended to June 1st of that year), and in the event of its failure it agreed to pay all "fines, penalties, or damages" imposed upon the defendant by any order of said railroad commission, or by any law of the state of Texas "on account of the failure to have said plant completed and accepted by the railroad commission of Texas." The defendant agreed to pay for the installation of the said plant the sum of $16,650—

"and the payment shall be made as follows: Said party of the first part [the plaintiff] shall operate said plant for sixty (60) days, at its own expense, and if the same shall work perfectly and satisfactory in every particular during that period of time, and after being accepted by the railroad commission of Texas, then said sixteen thousand six hundred and fifty dollars ($16,650.00) shall be paid in full to the party of the first part. In the event, however, that said plant shall not work satisfactorily, or be accepted by the railroad commission of Texas, then and in that event the party of the first part shall not be entitled to any part of said sum, but same shall be forfeited in full, and the work done and material furnished by the party of the first part shall also be forfeited to the party of the second part as liquidated damages for its failure to carry out the terms of this contract."

The plant comprised an interlocking safety switching system of signals, intricate and extensive, and operated by electricity. It was the first system in operation by electricity. It was regarded by all parties as somewhat of an experiment, and the approval of the state railroad commission was essential before the plant could be operated in that state. The contract was obviously entered into with the realization of the necessity of obtaining the acceptance of the plant by the railroad commission in order to make it effective, and that fact is very important in determining the liability of the defendant.

The plaintiff claims the plant was completed in the early summer of 1904, and was inspected by Mr. Thompson, the engineer of the railroad commission. That official made a report to the commission, under date of July 5th of that year, recommending improvements which he enumerated, and also that the temporary operation of the device be approved, awaiting the final action upon it. In pursuance of this report the railroad commission on July 7th entered an order approving the device "temporarily," and authorizing its operation "conditionally until not after October, 1904," and certain improvements were order-

ed to be made by said date, subject to the regulations of the commission. The order contained the following provision:

"And it is further ordered that upon the completion of said construction, additions, and improvements noted above, and upon the safe and successful operation, to the satisfaction of this commission, of the said device, as may be shown by the said daily reports filed, then this commission will, after further inspection on or before October, 1904, issue its order approving finally and authorizing permanently the operation of said device; otherwise said companies party to said crossing will be required to construct another device of character and design to be approved by this commission, which shall be first-class in every respect."

Until further order of the commission the speed of trains in passing through the limits of said device was not to exceed 10 miles an hour. Of the improvements ordered, some were to be made by the defendant and others by the plaintiff. It is quite clear from the text of this order that there was no intention on the part of the commission to accept permanently this device at that time. The order is careful to recite that the acceptance is only temporary. The project was still a tentative one, and was new to the engineer and the members of the said board, and it is reasonable that an adequate test of its efficiency would be required before the commission sanctioned its use. The device, if successful, was a beneficial one, adding materially to the safety of operating the trains at the crossing of these intersecting roads at this important railroad center.

On November 12, 1904, the engineer of the commission again inspected the device, finding "the conditions substantially the same as recorded" in his former report; and he orally reported to the commission, but no order was entered. Nothing further seems to have been done by the commission for nearly three years. In the meantime the device was used by the defendant and no payment was made. There was no claim by the plaintiff that any sum was due, or that the plant was completed, or that the commission was derelict in failing to inspect, or that the defendant was liable for the contract price by reason of its use of the device, irrespective of the sanction of the commission. Nor is there any suggestion that the plaintiff applied to the commission to accept the plant. Apparently the parties were awaiting the action of that body, in the interim testing the sufficiency of the device.

This suggestion is fortified to some extent in that the plaintiff kept its engineer at the plant making changes in it and looking after it until 1905, and again another engineer for a time in 1906. In the summer of 1907 the engineer, in compliance with the instructions of the commission, made another inspection of the plant, and under date of August 9th of that year rendered an elaborate report to that body advising its disapproval, and minutely described the defects existing in the device. On the 12th of August the commission entered a formal order disapproving the same and requiring the railroad companies using said crossings to proceed to the construction of a first-class interlocking device.

The plaintiff contends that for several reasons the approval of the railroad commission is not indispensable to the maintenance of the action, or at least the questions in controversy should have been submitted to the jury.

1. The engineers on behalf of the plaintiff, who were on the ground as above stated, testified that the system worked satisfactorily and properly.    The difficulty with this statement is that it was not the engineers of the plaintiff, but the railroad commission, who were by the agreement of the parties to determine the efficiency of the plant. Inasmuch as there was a direction of a verdict for the defendant, if the performance of the contract were an open question dependent upon the conclusions of engineers, the plaintiff's position would be invulnerable.    Unless, however, there is some important reason why the acceptance of the body chosen may be disregarded, its approval will be deemed essential.    Weeks v. O'Brien, 141 N. Y. 199, 36 N. E. 185.

2. It is the contention of the plaintiff that the defendant, by failing to comply fully with the conditions of the order of the railroad commission entered in July, 1904, has waived its right to insist upon an approval of the commission before its liability is fixed.    The failures referred to do not seem to relate to the mechanism or operation of the device itself; nor did they apparently influence the ultimate disapproval of the railroad commission.    The engineer in his final report stated:

"(1) The conditions imposed by your order of July 7, 1904, have only been partially carried out; but the features of your order which have not been completed would not now be considered material to the questions of final approval or rejection of this plant."

The failure of the machinery operating the switches to do its work properly, the weakness of the motors regulating the signals, and the bad adjustment of the detector bars are chief among the defects presented by this engineer in his report.    These are mainly inherent defects, and all relate to the system installed by the plaintiff, and not to the subsidiary appliances furnished or to be furnished by the defendant, and which might be essential in the operation of any interlocking switch system.

3. The plaintiff claims that the use of this system for three years by the defendant amounts to an acceptance, and that it cannot at this late date successfully urge the nonapproval of the railroad commission as a bar to the action.    The defendant could not do otherwise than use the device.    It was left in place and to be operated on the tracks of the defendant, and it would have been obliged to detach the appliances in order to stop the use of the signals.    The plant had not yet been fully tried, and all parties were simply anticipating the final action of the railroad commission.    No demand was made of the defendant for pay during this time, and no offer was tendered; and apparently there was no expectation that payment was to be made until the acceptance by the commission.    In that situation of affairs, the use of the device did not preclude the defendant from requiring full performance by the plaintiff.    Smith v. Brady, 17 N. Y. 173, 187, 72 Am. Dec. 442; Mack et al. v. Snell, 140 N. Y. 193, 198, 35 N. E. 493, 37 Am. St. Rep. 534.

Again, by the terms of the contract the plaintiff forfeited both the work performed and the material used in the erection of the plant. The removal of the appliances might endanger the operation of trains at the crossings, and the plaintiff was willing to pay this forfeiture penalty if its device did not receive the sanction of the commission.

The approval of the railroad commission was a matter of necessity, in order·to enable the defendant to use the device permanently.   Both parties understood this necessity.   The requirement in the contract was, therefore, not limited to the satisfactory operation of the plant antecedent to payment; but the acceptance of the commission was also made a prerequisite.   The approval was not to be secured by the defendant.   If the plaintiff expected payment, it must secure the sanction of this body.   The defendant was not called upon to take the initiative.   There is no intimation in the complaint, and no evidence, that the approval was unreasonably withheld, or that there was any collusion between the defendant and the official body charged with the inspection and approval of the plant.   There is no evidence that the plaintiff was urging action by the commission during this long period. The defendant from time to time was sending·reports setting forth "the daily condition of the apparatus and machinery of said device," and in the meantime the parties were quiescent until the successful issue of the system was fully developed and approved.

The commission was not the agent of the defendant, as claimed by appellant's counsel.   It was not the agent of either party.   Its approval of the system was essential, and the plaintiff undertook to procure that approval, which was just as much a part of the obligations assumed as the erection of the device.

The reports of the engineer of the commission may not establish the facts contained in them.   No matter.   The crux of the difficulty is that the plaintiff has failed to procure the sanction of the commission to the use of the device, and has not shown any satisfactory reason for this omission.

We think there was no question of fact to submit to the jury.   The judgment should be affirmed, with costs.

Judgment and order affirmed, with costs.   All concur, except ROBSON, J., who dissents.